## Ligon v. Allen.

(Decided January 23, 1914.)

### Appeal from Henderson Circuit Court.

1. Evidence—Photographs—Personal Injuries.—When in an action for personal injuries or other action of tort or in criminal prosecutions, it becomes material to know the location, surroundings, and condition of the premises upon which the accident, injury, or crime in controversy occurred, photographs of the location, if verified by proof that they are true representations, are competent evidence.

2. Evidence—Photogaphs—Rule as to Use of.—While a picture produced by an X-ray cannot be verified as a true representation of the subject in the same way that a picture made by a camera can be, the rule in regard to the use of ordinary photographs on the trial of a cause applies to photographs of the internal structure and condition of the human body taken by the aid of X-rays, when verified by proof that they are true representations.

3. Evidence—Photographs—Admissibility.—Where a witness testified that he took an X-ray photograph of a broken arm, and failed to testify that it accurately showed what he saw, or that it accurately represented the condition of the arm, the photograph was not admissible in evidence.

HINES & NORMAN, CLAY & CLAY and N. POWELL TAYLOR for appellant.

JOHN C. WORSHAM, H. M. STANLEY and NEWTON BELCHER for appellee.

Opinion of the Court by Judge Miller—Reversing.

This is an appeal from a judgment obtained by 'Amos Allen, who sues by his guardian, against the appellant, Dr. Peyton Ligon, for damages for alleged malpractice in the treatment of appellee's broken arm.

On December 4, 1911, the appellee, a boy about nine years of age, fell from a box to the floor of his father's store, and fractured the bone in his arm called the humerus, about two inches above the elbow. The appellant, a practicing physician, was promptly called and set the arm, binding it in splints and leaving the finger tips exposed.

Appellant says he examined the fracture and placed the ends of the bones in apposition, retaining them in position by placing an angular splint from axilla to the ends of the fingers inside of the arm, and from shoulder to elbow joint on the outside, and that over these he applied a wider bandage down to and including the hand, leaving a part of the fingers exposed. He left the boy about ten o'clock at night, with instructions for the father to call him promptly if the boy suffered any pain, or showed any symptoms that indicated the need of attention. The father did not call appellant during the night.

On the morning of the second day thereafter—about thirty-six hours after he had applied the dressing—appellant made his second visit, and from an examination of the exposed fingers he saw the circulation of the arm was not good. He thereupon removed the dressing and found the arm to be considerably swollen, with blisters on it, and other evidence of defective circulation. Appellant then called Dr. Letcher to see the case with him on the same day; and, owing to the defective circulation of the arm, the doctor discarded the splints and used only bandages to hold the cotton on the arm, and splints only for the purpose of protecting the arm.

Appellee testified that he had suffered greatly during the night, but that the pain was removed intermittently by taking several small tablets which appellant had left with his father to be given to the boy in case his arm pained him.

Appellant says, however, that the defective circulation was not due to the tightness of the bandage which had always been sufficiently loose not to interfere with

the circulation, but that the defective circulation was due to some injury to an artery or pressure from the fragments of the broken bone which caused the formation of a clot, and that this, with a natural swelling of the parts, produced such pressure upon the musculo-spiral nerve as to interfere with the function of that nerve; and that this condition frequently results from such fracture where no bandages or splints have been used. For about ten days appellee continued to suffer greatly with his arm. At the end of that time appellant and Dr. Letcher extended the arm for the purpose of increasing the circulation and relieving the pressure of the blood supply, Dr. Floyd administering the chloroform, and Dr. Forward being present. The doctors agree in the opinion that no surgical interference at that time was proper, and that such interference would have been dangerous. In the meantime the blisters upon the arm had developed into running sores.

About three weeks after the fracture the arm was examined by Drs. Watson and Smith. Upon a careful examination and measurement, the arm was found not to have shortened. Thereafter, appellant and Dr. Letcher made daily visits to appellee for sometime, and later visiting him at intervals of every three of four days, until February 14th, when they ceased to call at his father's residence, but instructed the father to bring the boy to appellant's office in order that he might observe the condition of the boy's arm and direct such treatment as might be needed. In the meantime, the father was instructed to massage and flex the fingers and elbow joint.

Appellant testifies that when he and Dr. Letcher saw the boy's arm for the last time on February 14th, its condition was much improved; that the bone had united, and showed no deformity or shortening of the arm; that it was healing in a satisfactory manner, and that appellant and Dr. Letcher then believed, that with continued massaging, which they repeatedly urged upon the boy's father as of supreme importance, the arm would be restored to all its motions. Appellee, however, did not go to appellant's office after February 14th. And a few weeks thereafter appellant learned from appellee's father that he had sent the boy away for treatment, the father declining, however, to tell where he had sent him.

Appellee testifies, however, that his arm became stiff and the hand drawn, and that by the time he had been discharged by appellant on February 14th, the muscles had hardened, rendering the arm and hand practically useless. This condition of the arm, however, was not reported to appellant.

In April appellee's father sent appellee to Dr. Ford, at Livermore, Kentucky, for examination and treatment. Dr. Ford took an X-ray photograph of the arm, and concluded that an operation would be necessary in order to relieve the pain caused by what he thought was the lapped bone of the broken arm. This operation was performed by Dr. Ford and his assistant, in which they took off about an inch of the protruding bone, and then wired the two ends together with a silver cord. Appellee testifies that the operation relieved the pain, and enabled him to raise his hand as high as his shoulder, but the muscles and ligaments in the arm remained atrophied, the arm becoming withered to some extent, and having little life.

Appellant testified that the X-ray photograph taken by Dr. Ford before the operation performed by him in April, did not correctly show the condition of the boy's arm as it was at the last time appellant saw it in February, since the arm at that time was not shortened or deformed, and the boy then had full use of it at the elbow joint; the fingers were not deformed, but could be flexed and extended considerably; that the arm as a whole was in a very good condition, and showed marked signs of improvement, with every reason to believe at the time that if appellant's directions to flex and massage the fingers and elbow joint, had been carried out, the use of the arm would have been restored. Dr. Letcher corroborates appellant in all respects as to the treatment of the boy's arm, and its condition on February 14th, and states that the treatment of the arm by appellant was that which is usually given and required by good surgery in such cases.

Dr. Letcher further testified that when he last examined the boy's arm on February 14th, there was very good motion in the elbow joint; no deformity of the arm at the point of the fracture nor in the hand; very good movement of the fingers and hand, with every indication that if the improvement should continue, good use of the hand and arm would result; and that he joined appellant

in urging upon appellee's father the importance of taking the boy to see the appellant at short intervals thereafter in order that he might see the injured arm and continue to advise as to future treatment.

Dr. Letcher further says that he is satisfied the symptoms which developed in the arm could not have been produced from any bandage that had been applied, but was largely due to the general physical condition of the boy, which was poor, the mother of the boy having been tubercular. and the boy addicted to the use of cigarettes.

He says that of all the fractures of the body, a fracture at the point where this one occurred, is most frequently attended by stiffness of the elbow joint.

Drs. Floyd, Watson, Poole and Forward all corroborated the appellant and Dr. Letcher, to the effect that the treatment of appellee's arm by appellant was the proper treatment under the circumstances.

Upon the trial the jury returned a verdict for $3,000.00 damages, and $105.00 doctors bills; but upon a motion for a new trial, the court having suggested to plaintiff that the verdict was for too much, and that he should remit a thousand dollars thereof, the plaintiff agreed that the remittur might be entered; whereupon the court reduced the judgment to $2,105.00, and the motion for a new trial was overruled. To this ruling the appellant excepted, and was granted an appeal.

Appellant assigns four grounds for a reversal: (1) Error in admitting the X-ray photographs in evidence; (2) newly discovered. evidence; (3) the verdict is flagrantly against the evidence; and (4) the court having found the verdict to be excessive, the plaintiff could not avoid a new trial by remitting a part of the verdict.

Dr. Ford was introduced by appellee, and testified that he first examined appellee's arm about April 4, 1912, and found the arm was swollen, distorted, and paralyzed, and that he operated on April 16th. He says the result of the operation was as good as he had expected, considering the time the boy was under his treatment, but that his father took the boy away before Dr. Ford had time to secure the results that he thought he could have secured in the way of improving the boy's condition had he remained longer under his treatment. Dr. Ford also stated that as he did not know the condition of the boy's arm at the time of the injury, he could not say positively

whether there was anything connected with the fracture of the arm to prevent a good apposition or union, and that he could not say whether there was any negligence at the time the arm was set; but in his opinion the arm was neglected afterwards, if it had been properly set. He also stated his first impression was that the trouble with the arm was due to a dislocation, but a closer examination showed a fracture of the humerus; and that while it is not difficult to reduce such a fracture, it is hard to get good functional results, and that bad results often followed. In his opinion the operation was necessary for the purpose of correcting the deformity and taking the pressure off of the muscles, common nerves and blood vessels, which was causing paralysis and obstructing the circulation.

As a part of his deposition Dr. Ford filed two X-ray photographs, one of which he took before the operation was performed, the other afterwards. These photographs were admitted in evidence over appellant's objection. Conceding the general rule to be that photographs are admissible in evidence when their accuracy is shown, appellant insists there is no proof showing that either of the photographs admitted in this case correctly represented the condition of the arm at the time it was taken, or that the photograph taken before the operation was performed represented the condition of the arm as it was when it was last treated or seen by appellant.

Did the circuit court err in admitting the photographs?

The general rule as to the admission of ordinary photographs is stated as follows in 17 Cyc., 417:

"When in an action for personal injuries or other action of tort, or in criminal prosecutions, it becomes material to know the location, surroundings, and condition of the premises upon which the accident, injury, or crime in controversy occurred, photographs of the *locus in quo* if verified by proof that they are true representations, are competent evidence. But the value and admissibility of the photograph, as in other cases, depends upon the fact that it is a correct representation of the place in question, and that the condition existing when it was taken was an exactly accurate reproduction of the condition existing when the accident, injury, or crime occurred. Hence if the photographs are taken so

long after the occurrence that the surroundings or conditions have changed, or whenever taken, if they do not for any reason appear to represent the subject or the condition existing at the time of the occurrence in controversy in such a way as to be instructive they will be rejected. Moreover, where the photograph is not offered as a mere general representation of the *locus in quo,* but to show distances, relative sizes, or locations of objects, it may be very deceptive and misleading, and it seems that much more convincing proof of its accuracy is required than in ordinary cases."

The rule above announced is equally applicable to X-ray photographs. In the volume above quoted from, at page 420, it is said:

"While a picture produced by an X-ray cannot be verified as a true representation of the subject in the same way that a picture made by a camera can be, the rule in regard to the use of ordinary photographs on the trial of a cause applies to photographs of the internal structure and conditions of the human body taken by the aid of X-rays when verified by proof that they are a true representation."

A photograph is only a pictured description of what the witness saw, and is, therefore, admissible, if the fact is relevant. The use of maps, models, diagrams, and photographs as testimony to the objects represented, rests fundamentally on the theory that they are the pictorial communications of a qualified witness, who uses this method of communication instead of, or in addition to, some other method. 1 Wigmore Ev., section 793.

In 1 Wigmore on Evidence, section 792 (3), it is further said:

"The objection that a photograph may be so made as to misrepresent the object is generally directed against its testimonial soundness; but it is of no validity. It is true that a photograph can be deliberately so taken as to convey the most false impression of the object. But so also can any witness lie in his words. A photograph can falsify just as much and no more than the human being who takes it or verifies it. The fallacy of argument occurs in assuming that the photograph can come in testimonially without a competent person's oath to support it. If a qualified observer is found to say, 'This photograph represents the fact as I saw it,' there is no more reason to exclude it than if he had said, 'The fol-

lowing words represent the fact as I saw it,' which is always in effect the tenor of a witness' oath. If no witness has thus attached his credit to the photograph, then it should not come in at all, any more than an anonymous letter should be received as testimony. There can be no middle ground between these two consequences."

If, however, the photograph should not represent the fact as the witness saw it, it is not admissible; and the only person who can show that it does represent the fact as the witness saw it, is the witness himself. It necessarily follows, therefore, that where the witness fails to make an X-ray photograph admissible by testifying to its accuracy, it is not admissible and should be rejected. This rule is recognized by all the authorities. See Stewart's-Legal Medicine, section 13; 2 Wharton & Stille's Med. Jur., section 564; 3 Whitthaus & Becker's Med. Jur., section 779.

In 1 Greenleaf on Evidence (16th Ed.), section 439h, it is said:

"The use of photographs taken by the vacum-tube-Roentgen rays may involve slightly different principles. Since the operator will usually not have perceived the object—usually a concealed bone—with his ordinary organs of vision, he will not be able to put forward the photograph as corresponding to the results of his observation; nevertheless, if he can testify that the process is known to him (by experience or otherwise) to give correct representations, the photograph is in effect supported by his testimony, and stands on the same footing as a photograph of an object whose otherwise invisible details have been rendered discernible by a magnifying lens."

The rule above announced has been more than once approved by this court. See L. & N. R .R. Co. v. Brown, 127 Ky., 746, and Bowling Green Gas Light Co. v. Dean's Extx., 142 Ky., 686.

In the last named case, we said:

"Of course, the accuracy of a photograph as a correct reproduction of what it purported to show should be established to the satisfaction of the court before being admitted as evidence, but when its accuracy is shown, we have no doubt of its admissibility. Wigmore on Evidence, sections 790-7; L. & N. R. R. Co. v. Brown, 127 Ky., 732; Higgs v. Minn. & St. P. R. Co., 15 L. R. A., n. s., 1162; Dederich v. Salt Lake City R. Co., 14 Utah,

137, 35 L. R. A., 802, and note; Elliott on Evidence, vol. 2, secs. 1224-8.''

See, also, Geneva v. Burnett, 65 Neb., 464, 58 L. R. A., 287; Mauch v. Hartford, 112 Wis., 50; Miller v. Minturn, 73 Ark., 183; Bruce v. Beall, 99 Tenn., 303; Elzig v. Bales, 135 Iowa, 208; Eckels v. Boylan, 136 Ill. App., 265.

Applying this well settled rule to the facts of this case, it is apparent that appellee failed to establish the preliminary requirements necessary to make the photographs admissible. Dr. Ford merely states that he took the photographs. He does not state that they correctly represent what he saw, or how they were taken, or that he had ever taken an X-ray photograph before, or knew anything about how they ought to be taken. We are given no assurance as to the character or accuracy of his X-ray machine, or its condition or working order.

While it may not be necessary to establish all of these facts in order to make the photographs admissible under the rule above stated, it is clear the rule requires that the accuracy of the photographs must be so established; for if they do not show what the witness saw they have no place in the case. In this respect the testimony of Dr. Ford is wholly insufficient; and as no other witness testified upon this subject, the circuit court should have sustained appellant's objection to the admission of the photographs.

In view of the conclusion reached, it is unnecessary to consider the other errors assigned.

For the error above indicated, the judgment is reversed and the case remanded for a new trial.