## Thomas v. Commonwealth.

(Decided January 13, 1916.)

## Appeal from Hart Circuit Court.

1. Criminal Law—Evidence—Ex-Ray Photograph.—It was improper to permit the Commonwealth to introduce testimony upon trial under an indictment for malicious striking and wounding with a deadly weapon, as to what an X-ray picture showed as to the effect of striking upon the body of the prosecuting witness, without proof by the person who took the picture, or other witnesses, that the picture was properly taken and is a true representation, and that it is otherwise properly authenticated; but when the witness giving such testimony at the same time states that he saw the parts being examined through the X-ray machine and the shadow made thereby and thus testifies from his own knowledge that the conditions were the same as that shown by the picture, the error in admitting the picture would not be, under such circumstances, so prejudicial as to authorize a reversal.

2. Criminal Law—Evidence—X-Ray Photograph.—Such testimony as mentioned above, upon the trial of the defendant in an indictment, will not be so scrutinized by the courts before admission, as it would in the trial of an issue where the condition of the parts displayed by the picture is the foundation and gist of the action, such as in cases of malpractice, etc., such condition of the parts displayed by the picture not being an essential element of the crime.

3. Criminal Law—Misconduct of Counsel.—Misconduct on the part of the attorney for the Commonwealth in language charged to him in his closing argument, must be such as it would be reasonably calculated to have wrongfully influenced the jury in its verdict, and to thereby have produced an unfair verdict, thus making the statement prejudicial to the substantial rights of the party against whom, or against whose defense the statements are made.

McCANDLESS & LARIMORE for appellant.

M. M. LOGAN, Attorney General, and R. T. CALDWELL, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, H. B. Thomas, was indicted by the grand jury of Hart county for "maliciously cutting, striking and wounding Clarence Owens with a steel saw, a deadly weapon, with the felonious intention to kill the said Owens, but from which striking and wounding he did not die." The offense is denounced by section 1166 of the Kentucky Statutes.

Upon a trial thereunder the appellant was convicted of striking the prosecuting witness "in sudden heat and passion and without previous malice and not in his necessary self-defense," as is denounced under section 1242 of the Kentucky Statutes, and his fine fixed at $350.00. His motion for a new trial having been overruled, he prosecutes this appeal.

The usual grounds are relied upon in the motion for a new trial; but there is urged upon us only two reasons for a reversal of the judgment: (1) It is claimed that the court permitted incompetent testimony to be introduced by the Commonwealth and refused competent evidence offered by the defendant; (2) and complaint is further made of alleged misconduct on the part of the Commonwealth's Attorney in his closing argument to the jury. There seems to be no objections to the indictment, or to the court's action in instructing the jury.

In order to understand the questions presented it will be necessary to make a brief statement of the facts. The difficulty between the parties occurred some time in June, 1914, in the town of Horse Cave, in Hart county, Kentucky. Many years previous to that time the father of appellant procured a franchise from the town of Horse Cave for the purpose of constructing a system of waterworks therein, and shortly thereafter the system was constructed and was operated by appellant's father until his death some years ago. After that, by inheritance and purchase, the appellant became the owner of the water plant, including the franchise, with perhaps the exception of about one-ninth interest therein. As a part of the system there was a pipe running near the edge of Higby street, which connected with a larger pipe in Main street; these streets, as well as the pipes therein, running at right-angle to each other.

Some time before the difficulty the prosecuting witness, Clarence Owens, and his associates, procured another franchise and constructed another system of waterworks, laying their pipe along Main street and close to the one belonging to appellant. Some years previous to the difficulty the witness Owens had purchased the lot abutting on Higby street, and which lot fronted on Main street (it being in the corner made by the junction of the two streets), and it was his contention that the lot which he so purchased extended far enough to include and take in the water pipe along by the side of his lot in Higby

street, and conceiving that he was the owner thereof, he attempted to disconnect it from the pipe belonging to the appellant on Main street and to connect it with the pipe of the new water company along Main street. In doing this he had procured the assistance of some colored people and they had excavated a hole for the purpose of doing the work, whereupon the appellant, discovering their purpose, approached them as to what they were doing and who authorized them to do it, and in very peremptory, positive and angry language ordered them to desist, which they did, and at this juncture the appellant discovered the near presence of the prosecuting witness, Owens, and demanded of him why he was having the work done. Owens answered by saying that the pipe along Higby street was his property, which was denied by the appellant, and a fight ensued, in which the appellant struck Owens with a saw, which was being used by the persons doing the work, and which he picked up upon the occasion.

The Commonwealth introduced ten witnesses besides Owens, the substance of their testimony being that when the appellant inquired of Owens as to why he was having the work done, Owens replied that he claimed to be the owner of the pipe on Higby street, and that appellant thereupon picked up the saw and said to Owens, "You are a damn liar," and, without Owens doing anything, he was struck by appellant on the head with one edge of the saw; that Owens was in his shirt-sleeves with his hands exposed, and he had no weapon whatever and made no effort to strike or in any manner harm the appellant. That when struck he made some exclamation and appellant replied—in appellant's own language—"You ought to hollow Oh! Any man that would stand by and let a negro knock his father in the head and not resent it, ought to hollow Oh!" Some of the Commonwealth's witnesses state that just before the lick Owens made some backward steps and the appellant advanced upon him. Immediately after this the appellant remarked that he would kill any son-of-a-bitch who would make that connection, and Owens went to the hole where the work had been commenced and stated that he intended to make the connection, whereupon appellant picked up some rocks and Owens procured a shovel, but nothing resulted from these demonstrations, as by that time a crowd had gathered and took possession of the appellant. A less number of

witnesses testified for the appellant Thomas, and the substance of his testimony, as well as his witnesses, is that when he inquired of Owens as.to why he was disconnecting the pipe, Owens declared that he was the owner of it and had the right to make the disconnection, which appellant denied, and that Owens called him a liar, whereupon he struck Owens. It was claimed by appellant that Owens, just before the lick, approached towards him with one hand in his hip pocket, and he is made to say that he thought he was in danger of suffering bodily harm, and for that reason struck the blow. A considerable preponderance of the testimony shows that the appellant was very much angered at what he termed the trespasses being committed to his property, and that he, while so incensed at the claim of Owens to the ownership of the water pipe, struck the blow without Owens either expecting it, or making any effort to do appellant any harm.

The wound was rather a severe one and with a little more force added to it would have no doubt resulted much more seriously. The wounded person remained about home for a few days, when his physician discovered symptoms of compression upon the brain. This was some days after the wound had been sutured with several stitches, and as a result of the symptoms it was the conclusion of the physician that the skull of Owens might be fractured, producing the suspected compression of the brain. He was taken to Louisville, in company with the physician, and besides the regular diagnosis an X-ray examination was made. The man who handled the X-ray machine did not testify, nor was there produced upon the trial what is commonly known as an X-ray photograph, showing the condition of the skull of Owens. Upon this question, however, Dr. Honaker, who had accompanied the prosecuting witness to Louisville, testified as follows: "Q. Did you see the shadow made? A. Yes, sir, I saw the picture made and I saw the sky-graft after it was made. Q. That sky-graft, what did that show? (Counsel for defendant objected to this question.) Q. Have you got that? A. No, sir. Q. What did it show? (Counsel for the defendant objected to this question, but the objection was overruled, to which counsel for defendant excepted.) A. It showed a fracture running from the point of injury on the skull on the top of the head. Q. Did you see the X-ray or the sky-graft made of his head? A. I was at the door of the dark

room and saw it come out. Q. Did you see the X-ray applied? A. Yes, sir. Q. Could you see the fracture? (Counsel for defendant objected to this question, but the objection was overruled, to which counsel for defendant excepted.) I could see the picture of the fracture." It is strongly urged that the admission of this testimony is sufficiently erroneous to authorize a reversal of the judgment. It is claimed that its admission violates the rule with reference to the admission of such testimony laid down in the case of Ligon v. Allen, 157 Ky., 101, as follows:

"In an action against a doctor for malpractice in connection with the treatment of a broken arm X-ray photographs of the arm were not admissible, where a witness merely stated that he took the photograph without stating that they correctly represented what he saw or how they were taken, or that he had ever taken such photographs before, or knew anything about how they ought to be taken, and without giving any assurance as to the character or accuracy of his X-ray machine or of its condition or working order, since photographs are admissible merely as pictorial communications of a qualified witness who uses this method of communication instead of or in addition to some other method and are not admissible without a competent witness' oath to support them."

The rule as expressed by this court in that case is a sound one and its observance eminently proper in all cases where the fact to be established by the introduction of such testimony goes to the root of the action, or defense, and constitutes a part of either. In the case from which the rule is quoted the very foundation of the claim upon which the suit was based was sought to be established by this character of testimony, and whensoever the testimony is to perform that office it should be safeguarded by the restrictions therein expressed.

In the instant case the purpose of the testimony is entirely different. The testimony was not necessary to establish the guilt of the accused. The thing which the two sections of the statute, *supra,* are directed against, is the wrongful striking another with the character of weapon therein mentioned. If it is a deadly weapon and the striking is malicious and not in the necessary self-defense of the accused, and made with the intent to kill, the act is a felony, but if the striking is without previous malice and not in self-defense, it is a misdemeanor only.

The extent of the physical injury inflicted has no part in the question as to the guilt or innocence of the defendant in either case. It might, when the injuries were so great as to shock the sensibilities of the jury, have some weight on the punishment, but this is the only office which it could perform, and, indeed, the only ground upon which its admission can be justified. We confess that we are somewhat at a loss to understand the testimony of the witness, Dr. Honaker. He says: "I was at the door of the dark room and saw it come out." We do not know what the witness means by the phrase "come out," nor is it perfectly clear to us what he means when he says: "I saw a picture made and I saw the sky-graft after it was made." He, however, says that he saw the X-ray machine applied to the head of Owens and that he could see the picture or shadow of his skull and it showed the fracture. This part of his testimony is no doubt admissible for he testified to what he himself saw. So that it makes but little, if any, difference as to his other testimony, as above quoted. Moreover, this witness and Dr. Comstock, another local physician at Horse Cave, testified that there were symptoms of a fracture. We are convinced that under the circumstances of this case, considering the purposes of the testimony as introduced, that the error, if any committed, did not substantially prejudice any of the rights of appellant.

It is insisted that the court erred in not permitting the witness Owens, upon cross-examination, to testify about the organization of the new company, and the purpose for which it was organized. We fail to see the relevancy of this testimony upon any phase of this case, but the error, if any, in its rejection could not have been prejudicial, because this fact was more or less developed in the progress of the trial, and the jury no doubt became fully acquainted with the situation.

The statement of the Commonwealth's attorney in his closing argument to the jury, which it is claimed constitutes misconduct on his part, was, in substance, that he said to the jury that a large number of the witnesses introduced by the appellant were non-residents of the town of Horse Cave. The proof shows that a number of these witnesses were non-residents, but whether as many of them as the Commonwealth's attorney stated, we are not advised. But howsoever that may be, we are unable to discover any prejudicial effect it may have had upon ap-

pellant's defense. It is not claimed that any of the witnesses were non-residents of Hart county, and the jury, no doubt, or some of them, were acquainted with the witnesses, and were fully prepared to give the testimony of each of them all the weight to which it was entitled. This court in a number of cases has condemned argument of counsel that would be calculated to prevent the litigant from having a fair trial, but we know of no case where such an inconsequential effect, if any effect, which the language here complained of would have produced, was reversible error.

We are convinced that the appellant has had a fair and impartial trial, and the judgment is affirmed.