**PHILIP MORRIS TOBACCO COMPANY
et al., Appellants,**

v.

**Virginia M. LEVAN, Appellee.**

Court of Appeals of Kentucky.

Oct. 16, 1970.

C. Dant Kearns, Kent McElwain, Stites & McElwain, Louisville, J. Keller Whitaker, Frankfort, Workmen's Compensation Board, for appellants.

John F. Stewart, Louisville, for appellee.

PALMORE, Judge.

Philip Morris Tobacco Company, its workmen's compensation insurance carrier, and the Workmen's Compensation Board appeal from a judgment of the Jefferson Circuit Court which set aside an order of the board denying compensation benefits to the appellee, Virginia Levan, and substituted an award for permanent total disability.

Mrs. Levan was a production line employee of the tobacco company. Her job consisted of taking trays from a conveyor, filling them with tobacco, and then placing them in "makers." She was required to lift trays weighing from 35 to 40 pounds to a height above her shoulders. Before going to work for the tobacco company in 1967 she had been employed in a restaurant, but in what capacity the evidence does not reveal. According to her testimony, on April 10, 1968, while she was dong her regular work hanging trays

she experience a sudden, stabbing pain and noticed that her left ribs were protruding. She reported at once to her supervisor and was sent to a company nurse, who noted the incident but took no further action to secure examination or treatment by a physician. Mrs. Levan continued working until about the first of August, at which time the pain in the affected region became so acute that she obtained sick leave and quit work. Meanwhile she had been consulting her regular physician, and on August 23, 1968, he referred her to Dr. Richard T. Hudson, an orthopedic surgeon and assistant professor at the University of Louisville School of Medicine.

Dr. Hudson saw Mrs. Levan several times between August 23, 1968, and March 7, 1969, when his deposition was taken. He found that she was suffering from a prominence of the 10th and 11th ribs anteriorly on the left side and fitted her with a rib belt. On February 26, 1969, he made X rays of her chest and "could not see any sign of injury," though he noticed a congenital deformity in that the left 12th rib was longer than the right one, which he did not think had anything to do with her present symptomatology.

Dr. Hudson testified that Mrs. Levan's pain "involves the costro-chondral cartilages of the anterior ends of the 10th and 11th ribs on the left side" and is "an occupational condition" which is aggravated by the handling of trays overhead. He concluded that it is permanent and that she will not be able to return to the same type of work. He did not think she had an underlying predisposition to this physiological problem.

The only expert testimony tending to refute that of Dr. Hudson was given by Dr. Paul L. Dent, a physician regularly employed or retained by the employer. He examined the claimant on August 2, 1968, and May 19, 1969, before giving his deposition, though he did not remember having seen her on August 2, 1968. At the time of his last examination he sent Mrs. Levan to "an X-ray man," a Dr. Miller, and used Dr. Miller's report as a substantial basis for his diagnosis and opinion. He did not himself see the X-ray films. Counsel for Mrs. Levan therefore objected to his testimony relating to the X rays and moved that it be stricken.

As we understand Dr. Dent's testimony, he determined from his own examination that Mrs. Levan had a protrusion of the 9th, 10th and 11th ribs and then procured the X rays, with the following result:

Q. "And what were your findings on the X-ray examination?"

A. "Dr. Miller, who is an X-ray man, states that on her films there was a normal study of the ribs and a normal study of the thoracic spine."

Q. "Well, what was your diagnosis, Doctor?"

A. "The only diagnosis made was that she had a deformity of the rib cage anteriorly on the left lower side."

\* \* \* \* \* \*

Q. "Do you have an opinion based on a reasonable medical probability as to whether there is any causal connection between the rib protrusion of the ninth, tenth and eleventh ribs that you have described in the performance of this work function of hanging trays?"

A. "No. The probabilities are that she could have been born with this deformity of the rib cage—protrusion of the ribs. I know of no other connection between that and her work, because in hanging trays they are using their arms mostly, and that doesn't or shouldn't interfere with her rib cage."

Q. "Did you find any problem with her intercostal cartilage or the cartilage and muscle in the area of her ribs?"

A. "The only thing that we could find was a bony—two or three ribs there were more prominent on the distal end than

which you normally see; this flared edge, in other words."

\* \* \* \* \* \*

Q. "Is a condition like this sometimes a congenital deformity?"

A. "Yes."

Q. "What are other causes of it other than congenital deformity?"

A. "Well, it could be caused by dislocation of the distal end of the ribs at the costochondral junction."

Q. "How could that be accomplished?"

A. "I have known it to happen from husbands loving their wives, just squeezing them, or in a car accident or any type of accident it is liable to fracture a rib. And at times it can cause a dislocation at the distal end. Instead of fracturing the rib it will slip at the end. It's a cartilage or soft union, in other words, and it can slip off."

Q. "Did the X-ray examination reveal any dislocation?"

A. "No."

It is not easy to ascertain from Dr. Dent's testimony how much he depended on the X-ray report of Dr. Miller in arriving at his medical conclusions. However, it is significant that after performing a physical examination himself he felt it necessary or advisable to take the further step of obtaining an X-ray examination. Hence it does not seem unreasonable to assume that the X-ray report was of material value. Certainly it cannot be assumed that he would have been willing to rest on his opinion without the report from Dr. Miller. Stated another way, the X-ray report was an essential element in a process of elimination, because it enabled Dr. Dent to exclude all possible causative factors which, if present, would have been disclosed by the X-ray examination, hence elevating a tentative hypothesis into a positive conclusion.

■ While it may be true that the board is not held to the same technical strictness as are the courts in the admission of evidence, we cannot sanction the reception of rank hearsay. Even if it be assumed that Dr. Miller was qualified to and did take and interpret the X-ray films, none of which was proved, still it was up to him and not Dr. Dent to give the testimony. We are not aware of any precedent, at least in this jurisdiction, under which one doctor may be permitted to quote another's findings or opinions. To the contrary, see Croley v. Huddleston, 301 Ky. 580, 192 S.W.2d 717, 720 (1946), and Ligon v. Allen, 157 Ky. 101, 162 S.W. 536, 538–539, 51 L.R.A.,N.S., 842 (1914). Unquestionably, the evidence was inadmissible and should have been stricken, and without it Dr. Dent's opinion does not have substantial probative value.

Aside from Dr. Dent's discredited opinion there was no probative evidence to suggest that Mrs. Levan's condition did not result from her work. The company nurse testified that upon reporting to her on April 10, 1968, Mrs. Levan said she had first noticed the protrusion on the previous Sunday, April 7, 1968, while getting out of an automobile. Mrs. Levan denies this, but it is immaterial, because if, as Dr. Hudson says, the internal condition producing the pain and disability is attributable to her work it makes no difference when she first noticed the protrusion.

It was testified by a personnel officer and admitted by Mrs. Levan that she applied for and received disability benefits for 13 weeks following August 2, 1968, under a group insurance policy that covered injury and illness arising outside the employment. From an evidentiary standpoint this may have amounted to an admission on her part if it had been shown that she knew the policy did not cover occupational disabilities. However, that was not shown. Hence her application for and receipt of the insurance benefits is irrelevant.

■ Mrs. Levan was 35 years of age. She testified that she had never experienced any difficulty with her ribs before

April 10, 1968. Even if she had a pre-existing deformity, there is no evidence that it was in anywise disabling or would have become so except for the stress of her work in the tobacco company's production line. It is our opinion that the legitimate evidence in the record is substantially uncontradicted and requires a conclusion that her disability is attributable to the employment.

The employer does not make the contention that if Mrs. Levan's disability is indeed work-connected it is nevertheless partial rather than total, but in view of testimony by Dr. Hudson that she can still do all kinds of work women are accustomed to doing other than lifting things over her head it is our opinion that she is not totally disabled. We do not believe that the particular type of work she was doing for the tobacco company constitutes a specialized occupational classification. Cf. Walsh v. John F. Humphrey Company, Ky. (decided October 2, 1970).

The judgment is affirmed in part and reversed in part with directions to remand the cause to the board for determination of appellee's partial disability and the entry of an award accordingly.

All concur.